[Civ. No. 5466. Fourth Dist. July 18, 1957.]

CHARLES W. CARLSTROM, Appellant, v. LYON VAN AND STORAGE COMPANY (a Corporation), Respondent.

Sloane & Fisher for Appellant.

Gray, Cary, Ames & Frye for Respondent.

BARNARD, P. J.—This is an appeal from a judgment in favor of the defendant in an action for declaratory relief.

The plaintiff leased to the defendant for a term of 20 years beginning on August 1, 1948, the southeast corner of a building, formerly known as "Building No. 1 of Convair Plant 2," at a monthly rental of $2,286. The 14th paragraph of the lease provided that the lessee agreed to install "any partition that may be necessary" to separate the leased premises from any adjoining portion of the building; that such partition should comply with all regulations or directions of any governmental authority having jurisdiction over the same; and that any type of partition which does so comply shall be deemed sufficient. In the 5th paragraph it was provided that the lessee was to pay all charges for water, gas, electricity or other utility services used by it; and that "upon demand of lessor from time to time" the lessee should sever and separate any such service facilities from those serving the rest of the building and install separate meters. In the 22nd paragraph it was provided that if the lessee failed to perform any covenant of the lease, and if such default should continue for 30 days after written notice from the lessor, the lessor might at his option terminate the lease. The 17th paragraph is headed "BANKRUPTCY, INSOLVENCY, RECEIVERS OR ATTACHMENTS" and reads:

"That should the Lessee at any time during the term hereof become insolvent or should proceedings in bankruptcy be instituted by or against the Lessee or should the Lessee compound its debts and assign over its estate or effects for the

payment thereof, or should any execution or attachment be issued against the Lessee or the effects of the Lessee and not be removed within 10 days thereafter by the posting of sufficient bond or otherwise, or should a receiver or trustee be appointed over the property of the Lessee whereupon a public officer or agent should be placed in charge of the demised premises and remain in charge thereof for a period of 30 days, or should this lease by operation of law devolve upon or pass to any person or persons other than the Lessee, then and in any or either of such events the Lessor may, at its option, terminate this lease and the same shall become null and void and of no further force or effect whatsoever.''

On April 30, 1953, the United States filed in the federal court a declaration of taking, effective May 1, 1953, in connection with a condemnation proceeding in which it finally acquired all of the building in which the leased premises were situated. By that declaration of taking it acquired, in addition to other rights of possession, immediate right to possession of all of the premises covered by this lease for a period of 14 months, with four options to renew for a period of one year each. On January 18, 1954, under an order of the federal court, the defendant received from the registry of the United States District Court $50,841, as the estimated fair compensation for the taking of the leasehold interest for a period of 14 months; and the plaintiff received $122,395. This order was made without prejudice to the rights of these parties as between themselves. On January 22, 1954, the plaintiff served on the defendant a notice purporting to terminate the lease as of February 28, 1954. This notice stated that the defendant had failed to separate the service facilities and install separate meters, and had failed to construct a partition as required by the lease, after having been given the required notice; that by reason of the condemnation action and the Declaration of Taking filed in the federal court this lease has, by operation of law, ''devolved upon the United States of America,'' giving the lessor the right under Paragraph 17 of the lease to terminate the lease; and that the lessor elects to and thereby does terminate the lease for each of the reasons named.

This action was brought on August 9, 1954. The complaint alleges, among other things, that a controversy exists between the plaintiff and the defendant as to their respective rights and duties under the lease, and as to whether this lease has ''devolved upon'' the United States by reason of the operation of Paragraph 17 of the lease. In a second count it alleges

that the defendant received $50,841 from the registry of the United States District Court as the estimated fair compensation for taking the leasehold interest for 14 months; and that the defendant should be required to pay plaintiff his proper proportion of that payment, and any amount that might be collected for any subsequent period. The prayer was for a judgment declaring the rights of the parties; declaring that the lease is terminated and declaring the effective date of such termination; and requiring the defendant to pay to the plaintiff any amounts it may receive which are attributable to the period subsequent to the termination of the lease. On June 16, 1955, in the condemnation proceeding, the United States took title in fee simple to the entire property of which the leased premises were a part. An amendment to the complaint was filed stating that fact.

There is no dispute as to the facts and, among other things, the court found as follows. The defendant remained in possession under said lease up to April 30, 1953, and from that date to April, 1954 occupied the premises subject to said lease with the consent of the United States. On taking possession the defendant constructed and thereafter maintained a partition in the form of a cyclone fence of heavy woven wire separating the leased premises from the remainder of Building Number 1. In the winter of 1948-49 the defendant constructed separate gas utility installations and a separate gas meter, and thereafter purchased its gas directly from the San Diego Gas and Electric Company. On August 24, 1949, the plaintiff informed the defendant by letter that it was "now necessary" for the plaintiff to sever the utilities and construct a fireproof partition. On September 6, 1949, the plaintiff notified the defendant that no partition or severance of utilities would be required at that time. On June 3, 1950, the plaintiff notified the defendant by letter that it was required to promptly comply with the terms of the lease by installing a partition and by severing all utility service facilities and installing separate meters. On June 6, 1950, the plaintiff informed the defendant that the construction of a partition and the severance of utilities would not accomplish the purpose they then had, and that what the plaintiff actually desired was the entering into of an arrangement which would extricate him from a difficulty he had with another company. On July 7, 1950, the defendant informed the plaintiff by letter that after a study of the San Diego city code it had concluded that it was not necessary to install any partition other than

the one already provided; and that as to the severance of utilities it would proceed upon the receipt of notice requiring the same but that it hoped that severance would not be requested unless it would serve a useful purpose in connection with the use and occupation of the building.

On March 15, 1951, the plaintiff served on the defendant a demand that it sever and separate any and all service facilities covered by the lease and install separate meters. During March, 1951, the defendant arranged to purchase its electricity from the Consolidated Vultee Aircraft Corporation, a lessee of adjoining property in Building Number 1, and the plaintiff ceased furnishing such electricity to the defendant. Consolidated purchased the said electricity from the San Diego Gas and Electric Company in its own name, but distributed it through installations partly owned by the plaintiff. On April 12, 1951, the plaintiff wrote to the defendant suggesting that after the completion of its arrangements to purchase electricity from Consolidated the plaintiff and defendant should further discuss whether or not the defendant would be required to sever the utilities.

On January 9, 1953, the plaintiff gave the defendant notice that it "elects and requires" it to sever any and all utility facilities and to install separate meter systems. At that time it was common knowledge that the United States was contemplating the immediate condemnation of Building Number 1; the defendant had already severed the gas utilities and was then purchasing electric power from Consolidated and not from the plaintiff; and the defendant had received no bills for utilities of any sort from the plaintiff after March, 1951. The clause requiring the severance of utilities upon demand was intended to enable plaintiff to be relieved of the necessity of selling utilities to his tenants after he leased adjoining premises to others, and to be applicable when there should be a good reason for the severance of utilities by reason of the use and occupancy of adjoining portions of said building. There was not in January, 1953, or at any other time, any such reason and the plaintiff in giving said notice in said month did not do so with the good faith, intention and desire of obtaining the severance of said utilities.

After the letter of July 7, 1950, from the defendant to plaintiff and up to January 22, 1954, the plaintiff did not make any demand on the defendant to construct a partition, and during that time the plaintiff entered into various negotiations and discussions with the defendant with respect to

this lease without making any reference to any such partition. From January 9, 1953, to January 22, 1954, the plaintiff made no demand on the defendant with respect to the severance of utilities. The rent payable under the lease up to and including the rent for the month of April, 1954, was paid to and received by the plaintiff. On April 6, 1954, the plaintiff wrote a letter to the defendant stating that the rent for the months of March and April and all future payments were being and would be applied on other alleged and disputed claims. On April 8, 1954, the defendant wrote to the plaintiff stating that the rent sent in February and March was intended as rent under the lease, and that all rents paid in the future would be intended as rent payable under the lease and must be accepted as such or rejected. Subsequent to receiving that letter of April 8 the plaintiff cashed the rent check for the month of April. Thereafter, rent checks for each month up to June, 1955, were sent to the plaintiff containing a notation that they were intended as rent under the lease and for no other purpose. The rent checks for the month of May, 1954, up to and including June, 1955, were received by the plaintiff but were not cashed nor returned to the defendant.

The plaintiff did not at any time after 1950 give the defendant any notice of default allowing defendant 30 days in which to remedy any alleged default, nor any other notice asserting the existence of a default or a declaration of termination of the lease except the notices of January 22, 1954, and April 6, 1954, above referred to. Paragraph 17 of the lease "was not intended to apply to, or become effective by reason of, the taking of the property covered by said lease or any interest therein by eminent domain, and neither the lease nor any interest therein has devolved upon the United States of America within the meaning of the said paragraph." The court makes no findings with respect to the money received by defendant from the registry of the United States District Court, in connection with the condemnation proceedings, as such findings are made unnecessary by the other findings made.

As conclusions of law, it was found that the defendant was not obligated to take any action to comply with the notice of January 9, 1953; that the plaintiff by his conduct waived any and all defaults or forfeitures by defendant under the lease and declarations of default, and is guilty of laches; that the lease did not terminate by operation of Paragraph 17

thereof; that the defendant is entitled to a judgment that the lease has not been terminated by the operation of any clause in the lease, or as a result of any alleged breach thereof; that the lease remains in full force and effect "subject to the rights of the United States except to the extent that the interests of both parties in the leased property were necessarily suspended or terminated by the taking thereof in the condemnation proceedings and the performance of the covenants thereby rendered futile or impossible or unnecessary"; and that the plaintiff is not entitled to have the defendant account to him, by reason of any facts or circumstances alleged in the complaint, for any sums received by the defendant in connection with the condemnation proceedings. Judgment was entered accordingly, a motion for a new trial was denied, and the plaintiff has appealed from the judgment.

Briefly stated, the appellant contends that under Paragraph 17 of the lease he was entitled, at his option, to terminate the lease when the government took over the right of possession of the leased premises; that the lease was thus terminated on April 30, 1953, when the government took the right of possession or at least 30 days after January 22, 1954, when notice of election to terminate was served; that when the government took its possessory right on April 30, 1953, the relationship of landlord and tenant between Carlstrom and Lyon was effectively destroyed; that thereafter the government was the landlord, and Carlstrom was not entitled to collect any further rent and could not insist on any change of the utility facilities or require the erection of a wall; and that the court should have found that the lease was terminated under the terms of Paragraph 17 of the lease, and should have found the precise date of such termination. It is also contended that the appellant had the right to terminate the lease for respondent's violation of its covenants; that the evidence is not sufficient to show a waiver of such defaults; that the lease was destroyed when the United States became entitled to possession on April 30, 1953, and any alleged waivers by Carlstrom, or deposits of monthly rent payments to his account, could not breathe the breath of life into it; that any waiver which would be effective would have to occur after January 22, 1954, when formal notice of default and termination was given; and that there is no evidence which would support a finding that between the serving of the notice on January 22, 1954, and the filing of the action, Carlstrom

intentionally abandoned the position asserted by him in that notice.

■ Ordinarily, where the government condemns leased property thereby taking title to the whole property in fee the lease is obliterated, and, in the absence of an agreement to the contrary, the parties to the lease are each entitled to compensation for the taking of their respective rights. However, where the property is taken for a term less than the term of the lease, the lease is not obliterated; the tenant must continue to pay rent but is entitled to compensation for the temporary taking; and the landlord is not entitled to share in such compensation since he receives his rent and has lost nothing for the time being. (*Leonard* v. *Auto Car Sales & Service Co.*, 392 Ill. 182 [64 N.E.2d 477]; *United States* v. *194,717 Square Feet*, 60 F.Supp. 314; *United States* v. *General Motors Corp.*, 323 U.S. 373 [65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390]; *United States* v. *21 Acres of Land*, 61 F.Supp. 268.)

■ The main question here is whether that part of Paragraph 17 of the lease which reads "should this lease by operation of law devolve upon or pass to another person or persons other than the lessee" gave the appellant the right to terminate this lease because of the federal condemnation proceeding. In deciding such a question, as recognized by the federal courts, great weight should be given to the intention of the parties as disclosed by the terms of the lease, and a clause in the lease purporting to give such a right should be strictly interpreted. In *United States* v. *150.29 Acres of Land*, 148 F.2d 33, the circuit court held that a clause in a lease providing that the lessor could terminate the lease if the property should be condemned by any municipality or subdivision of the state where the property is located, or "by any company or corporation lawfully qualified to exercise the right of eminent domain," would not apply to a condemnation by the United States government.

■ It clearly appears from the language used in Paragraph 17 that the parties intended that paragraph to apply to a transfer of this lease through bankruptcy, execution or similar proceedings which would have the effect of continuing the lease in force, with the possible substitution of an unsatisfactory tenant, and not to a condemnation proceeding obliterating all interest of both lessor and lessee in the property. The use of a "condemnation" clause in addition to a "bankruptcy" clause in such a connection is not unusual, and the

absence of a condemnation clause here and the provision covering the passing of the lease ''to any person or persons'' other than the lessee is a further indication that this paragraph was not intended to apply to a taking of the property through condemnation proceedings, especially by the United States government.

Moreover, the right to terminate the lease given by this part of Paragraph 17 would arise only when the entire lease itself, by operation of law, devolves upon or passes to a third person. The language used clearly refers to the passing of the lessee's full interest or leasehold estate to a third person, with the lease still in effect and giving the third person a continued right of possession. ██ ''An estate 'devolves' upon another when by operation of law, and without any voluntary act of the previous owner [of that estate], it passes from one person to another.'' (*First Nat. Bank* v. *Menke,* 128 Cal. 103 [60 P. 675]; *Francisco* v. *Aguirre,* 94 Cal. 180 [29 P. 495].) ██ The clauses of Paragraph 17, relied on by the appellant, clearly contemplate a situation where if the option to terminate there given was not exercised the lease would continue in operation with a substituted tenant and where both lessor and lessee would continue to have interests and rights created by or recognized by the lease itself. The entire lease here in question did not ''devolve upon or pass to'' the United States upon the first taking of temporary possession since that taking was for a limited time only and would not affect the remaining term of the lease covering some 10 or possibly 14 years, and since during the term of that temporary taking the United States did not become a tenant under the lease, and the respondent was still obligated to pay the required rent to the appellant. The lease did not ''devolve upon or pass to'' the United States, within the meaning of Paragraph 17, through its subsequent taking of fee title to the property since, under the federal statutes and decisions, the lease was then obliterated leaving no remaining rights which could be exercised by either party through reliance on the lease itself. When the final taking by the government occurred the rights of both parties to the lease ended, including any right to terminate the lease given by Paragraph 17, and the appellant could not then exercise such a right even if it had previously existed. The trial court was therefore correct in finding and holding that neither this lease nor any interest therein has devolved upon or passed to the United States within the meaning of Paragraph 17 of

the lease, and that the lease was not terminated by the operation of Paragraph 17 or appellant's notice of termination as based upon that paragraph of the lease.

 Whether the lease was effectually cancelled by the appellant because of defendant's default in two respects, or whether any such defaults were waived, presented questions of fact for the court. With respect to the matter of the construction of a partition Paragraph 14 of the lease was vague and required only any partition ''that may be necessary.'' There was no evidence showing the necessity for any partition other than the one placed there by the respondent, and the evidence conclusively shows a waiver by the appellant with any further compliance of that provision. With respect to the severance of the utility service facilities, there was what might well be considered a substantial compliance with that requirement within the meaning of the lease and in view of the purpose designed to be accomplished by inserting that provision in the lease. Moreover, the evidence discloses that compliance with that provision was intentionally dispensed with for a period of about four and a half years because the purpose of that requirement had, in practical effect, been accomplished by severing the utilities to the extent that the appellant was relieved from all obligation to supply such utilities or to pay any bills in that connection. The evidence also indicates that the demand for compliance with that provision, made on January 9, 1953, was made for the purpose of its supposed effect on appellant's position in the condemnation proceeding, and not for any desire or wish to have the severance actually made, and the court so found. Even after that notice was given the appellant did not act promptly by refusing to recognize the continued existence of the lease, and allowed the matter to rest until after compliance by the respondent became impossible because of the taking of the temporary right of possession by the United States, and until after the respondent received a large sum for the interference with his lease interest, while continuing to accept payments of rent for some 16 months at least after that notice was given. While the acceptance of rent alone has been held in some cases not to be sufficient to sustain a finding of waiver under the circumstances there involved, the evidence here, including the evidence of the other acts and conduct of the appellant, is sufficient to support the court's finding and conclusion that the appellant waived any default, and that

he was not entitled to cancel the lease because of any such defaults.

There was no evidence that any other debt of the respondent to the appellant existed, to which the rent payments referred to in appellant's letter of April 6, 1954, could be applied. Some criticism is made of the court's statement in the findings and judgment that this lease remains in full force and effect, since the lease became ineffective when the government took title in fee. This statement was qualified by the words "subject to the rights of the United States," and was a part of the declaration that the lease had not been terminated by the operation of any clause therein or as a result of any alleged breach thereof. The court was considering only the rights of the parties as presented by the issues in this case, and no prejudice appears in this connection. We find nothing in the judgment which would in any way interfere with the jurisdiction of the Federal District Court in completing its final award of damages to the respective parties in the condemnation proceeding still pending in that court. In this equitable proceeding the court was called upon to construe the provisions of the lease, in view of the acts and conduct of the parties, and its decision and judgment appear to us to be eminently fair and just.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.